| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Medical Educational & Health Service, Inc. | Municipality of Mayagüez, (see attach sheet) |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Rafael González Vélez<br>1806 Calle Mcleary Suite 1B<br>San Juan, PR 00911-1321  (787) 726-8866 | |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☒ Debtor  ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor  ☐ Other<br>☐ Trustee | ☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor  ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Breach of Contract, Specific Performance, Tortious Interference with Business Relation, R.I.C.O., Injunction and Damages, Recovery of Property of the estate.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☒ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☒ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☒ 71-Injunctive relief – imposition of stay
- ☒ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☒ Check if a jury trial is demanded in complaint | Demand $ 54,000,000.00 |
| Other Relief Sought | |

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Medical Educational + Health Service, Inc. | BANKRUPTCY CASE NO.<br>10-04905 (BKT) | |
| DISTRICT IN WHICH CASE IS PENDING<br>Puerto Rico | DIVISION OFFICE | NAME OF JUDGE<br>Brian K. Tester |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF<br>Mayagüez Medical Center - Dr. Ramón E. Betances, Inc. | DEFENDANT<br>Medical Educational + Health Service, Inc. | ADVERSARY PROCEEDING NO.<br>10-00146 (BKT) |
| DISTRICT IN WHICH ADVERSARY IS PENDING<br>Puerto Rico | DIVISION OFFICE | NAME OF JUDGE<br>Brian K. Tester |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>August 31, 2010 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Rafael González Vélez | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

Defendants

HON. JOSE GUILLERMO RODRIGUEZ, IN HIS PERSONAL AND OFFICIAL CAPACITY, HIS WIFE, MRS. MARISEL MORA GONZALEZ AND THEIR CONJUGAL PARTNESHIP OF PROPERTY,

DR. ORLANDO MARINI,

MR. JOSE QUIROS, HIS WIFE MARY DOE QUIROS AND THEIR CONJUGAL PARTNERSHIP OF PROPERTY,

SISTEMAS INTEGRADOS DE SALUD DEL SUR OESTE, INC.,

MAYAGUEZ MEDICAL CENTER-DR. RAMON EMETERIO BETANCES, INC.,

MANATI MEDICAL CENTER, INC.,

MR.JOHN DOE;

RICHARD ROE;

INSURANCE COMPANIES A, B AND C.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MEDICAL EDUCATIONAL & HEALTH SERVICE, INC. | CASE NO.: 10-04905 (MCF) /Ø𝒦𝒰 |
| Debtor | CHAPTER 11 |
| MEDICAL EDUCATIONAL & HEALTH SERVICE, INC | ADVERSARY NO.: |
| Plaintiff, | RE: BREACH OF CONTRACT, SPECIFIC PERFORMANCE, TORTIOUS INTERFERENCE WITH BUSINESS RELATION, , R.I.C.O., INJUNCTION AND DAMAGES |
| v. | |
| INDEPENDENT MUNICIPALITY OF MAYAGUEZ, HON. JOSE GUILLERMO RODRIGUEZ, IN HIS PERSONAL AND OFFICIAL CAPACITY, HIS WIFE, MRS. MARISEL MORA GONZALEZ AND THEIR CONJUGAL PARTNESHIP OF PROPERTY, DR. ORLANDO MARINI, MR. JOSE QUIROS, HIS WIFE MARY DOE QUIROS AND THEIR CONJUGAL PARTNERSHIP OF PROPERTY, SISTEMAS INTEGRADOS DE SALUD DEL SUR OESTE, INC., MAYAGUEZ MEDICAL CENTER-DR. RAMON EMETERIO BETANCES, INC., MANATI MEDICAL CENTER, INC., MR.JOHN DOE; RICHARD ROE; INSURANCE COMPANIES A, B AND C. | PLAINTIFF DEMANDS TRIAL BY JURY |
| Defendants. | |

## VERIFIED COMPLAINT

**TO THE HONORABLE BANKRUPTCY COURT:**

   **COMES NOW** Medical Educational & Health Service, Inc. (hereinafter referred to as MEDHS), represented through its undersigned attorney and very respectfully states, alleges and prays:

# I. JURISDICTION

1.    The Honorable Bankruptcy Court has jurisdiction over the present action by virtue of 28 USC 1331, et sec, 1334(b), 28 USC 1334(e), 28 USC 157 (b)(2)(A, E, O), 11 USC 105(a), 11 USC 542, and Federal Rule of Bankruptcy Procedure 7001(1&7).  Original jurisdiction is also vested in this Honorable Court by virtue of 18 U.S.C. §1961-1968, 901 of Title IX of the Organized Crime Control Act of  1970, as amended, otherwise known as the Racketeer Influence and Corrupt Organization Act (R.I.C.O.) and in particular under 18 U.S.C.§ 1964 in its civil context

2.    Pursuant to cited 28 USC 1334(e) this court has **exclusive** jurisdiction over the property of the estate created under 11 USC 541 upon the filing of the above captioned Ch 11 case.  The most significant asset of said estate and the only directly producing asset is the lease contract with the Autonomous Municipality of Mayaguez, from which this action arises.  Furthermore, the value and preservation of other properties of the estate consisting of tangible assets is substantially dependent on the instant action.

3.    "To this end the court is given exclusive jurisdiction of all the indicated property [sec. 541 estate property] and of all disputes about ownership or lien interest in that property and about its disposition.  In general, the property is brought in custodia legis and accorded the court's protection ..." Treister, Fundamentals of Bankruptcy Law (ALI ABA 2006 Ed.), at §2.01(c)(3)

4.    This action involves matters that are core proceedings, and matters that are non-core proceedings under 28 USC 157.  As to the non-core

proceedings, Plaintiff consents to the entry of final orders by the Bankruptcy Court, but expressly preserves its right to jury trial, and demands such trial by jury as to all issues so triable.

5.    Supplemental Jurisdiction can and should also be exercised under 28 U.S.C.A. § 1367.

6.    This Court may and should exercise supplemental jurisdiction to claims under Article 1077 of the Puerto Rico Civil Code, 31 Laws P.R. Ann. § 3052, and under section 3081, 31 Laws P.R. Ann. § 3081 for breach of contract.

## II.    THE PARTIES

7.    Debtor, MEDHS, is a non-profit corporation created under the laws of the Commonwealth of Puerto Rico, with corporate registry number 44,970, and Taxpayer Id. Number 66-0660473.  MEDHS filed relief under Chapter 11 of the Bankruptcy Code on June 3, 2010.  MEDHS's principal place of business is located at Centro Médico de Mayaguez, Dr. Ramón Emeterio Betances, Carr. #2 Ave. Hostos, Mayaguez, Puerto Rico 00680 (this is the corporate address), and its phone number is (787) 834.6070.  Its sole business endeavor is to lease the Mayaguez Medical Center (hereinafter, the "medical center") from the Autonomous Municipality of Mayaguez and sub-lease it to different providers of medical and medical related services.

8.    The Autonomous Municipality of Mayaguez (herein after referred to as the "Municipality") is a political entity, separate from the Commonwealth, created or empowered as independent, pursuant to Commonwealth law.  It has legal capacity to sue and be sued, and to raise its own funds, which are separate

from those of the Commonwealth. Its governing officials, both the mayor and the members of the municipal assembly, are freely and directly elected by the voters, in separate ballot from that of the Commonwealth. It is included for the purpose of obtaining injunctive relief, to prevent its contract and property rights violations against MEDHS, as well as to obtain restitution for damages caused. It is also included for the purpose of enforcing the specific compliance with the contract it has with MEDHS and to pay for the damages that the violation of said contract has caused.

9.     The Hon. Jose Guillermo Rodriguez is the Mayor of Mayaguez (herein after, the "Mayor"), that is, its highest elected official and its chief executive authority. He is included in this complaint both, in his official or representative capacity, as mayor and as an individual who, acting under color of state or municipal law, violated MEDHS' constitutionally protected property rights. He is included for the purpose of obtaining injunctive relief against him, to cease the herein described violations as well as to obtain compliance with the specific terms of the contract. His wife, Marisel Mora González, and their conjugal partnership of property are included to answer, financially, for the damages that his unconstitutional and tortious actions have caused.

10.     Sistemas Integrados de Salud del Sur Oeste, Inc. (hereinafter referred to as "SISSO"), is a corporation, created under the laws of the Commonwealth of Puerto Rico and registered at the Commonwealth's Dept. of State. It was created pursuant to the Municipality's demands, as the operating, profit making, counterpart to MEDHS. It was intended and contracted, between

4

MEDHS and SISSO, that the later would sub-lease most of the medical center and take over the administration of the sub-leased portion of the same. The sub-lease and administration agreement, between MEDHS and SISSO, granted SISSO the authority to sub sub-lease the different facilities under its administration to medical goods and services providers. It was the purpose that the resulting income would satisfy the rent needs of the Municipality, as well as ensuring that the needed services were provided. Pursuant to the above criteria, it was required, by the Municipality, that SISSO guarantee the lease contract between the Municipality and MEDHS.

11. From the above described contract, certain parts of the medical center were specifically excluded. The reason was that said portions of the facilities had already been assigned to other entities, before the contract between MEDHS and SISSO was finalized. Specifically, among those, were the hospital's radiotherapy center, leased to Mayaguez Advanced Radiotherapy Center, Inc. (hereinafter, MARC), the emergency room and the center's parking.[1]

12. SISSO is included in this complaint because it failed to comply with the terms of the contract with MEDHS and its guarantee to the Municipality, to MEDHS detriment. Furthermore, it conspired with co-defendants Municipality and its Mayor, as well as co-defendants MAYAGUEZ MEDICAL CENTER-DR. RAMON EMETERIO BETANCES, INC., (hereinafter, "MMC"), Manati Medical Center, Inc. (hereinafter "Manati Med") and their principal Mr. Jose Quiros, to deprive Debtor/Plaintiff MEDHS of its rights under the contracts with the

---

[1] See Exhibit 32, Contract between MEDHS and SISSO, Annexes describing property object of sub-lease and property specifically excluded. See also Exhibit 34, Contract between MARC and MEDHS.

Municipality and SISSO. In so doing, it tortiously interfered with MEDHS contractual and business relations.

13.     The tortious actions were clearly directed at depriving MEDHS of its property rights without due process of law and were performed while acting in agreement with the Municipality and its Mayor, both state actors. Thus, SISSO became a state actor and answerable under 28 U.S.C. Sec. 1983.

14.     MEDHS seeks injunctive relief and damages against SISSO, for violation of their contractual agreement, for its tortious interference with MEDHS contractual relations and for its conspiratorial actions committed in agreement with state actors, in violation of MEDHS' property rights.

15.     Manati Medical Center, Inc. (hereinafter, "Manati Med."), and Mayaguez Medical Center-Dr. Ramon Emeterio Betances Inc. (hereinafter, "MMC") are corporations owned and/or controlled by co-defendant, Mr. Jose Quiroz.

16.     Manati Medical Center, Inc. is a corporation, on information and belief, duly registered with the Commonwealth's Dept. of State and dedicated to providing medical and medical related goods and services. It is included to answer for its intentional tortious actions, committed against MEDHS while acting in common accord with the other named co-defendants, including state actors as will be described below.

17.     Mayaguez Medical Center-Dr. Ramon Emeterio Betances Inc. (hereinafter, "MMC"), is a corporation created, among other things, to interfere

with MEDHS contractual and property rights and be the end beneficiary of the constitutional, contractual and tortious violations of MEDHS' rights. MMC conspired with the other co-defendants named in this complaint, to falsely represent itself, before potential sub-lessors and judicial forums, as the valid lessee of the medical center, with rights of dominion over the same. The same allegations made against SISSO, with the exception of contract violations, apply to MMC.

18.     The tortious actions described herein, were committed by both MMC and Manati Med and were clearly directed at depriving MEDHS of its property rights without due process of law and performed while acting in agreement with the Municipality and its Mayor, both state actors. Thus, MMC and Manati Med became state actors and are answerable under 28 U.S.C. Sec. 1983.

19.     MEDHS seeks injunctive relief and damages against MMC and Manati Med for their tortious interference with MEDHS contractual relations with SISSO and the Municipality and for their conspiratorial actions, committed in agreement with state actors, in violation of MEDHS' property rights.

20.     "A" Insurance Company is an insurance company incorporated under the laws of the Commonwealth of Puerto Rico and/or a place other than the Commonwealth of Puerto Rico, which issued a policy or policies to cover some or all of the risks and/or occurrences incurred by any of defendants mentioned in this complaint.

21.    "B" Insurance Company is an insurance company incorporated under the laws of the Commonwealth of Puerto Rico and/or a place other than the Commonwealth of Puerto Rico, which issued a policy to cover some or all of the risks and/or occurrences incurred by defendants and/or other mentioned officers, and or employees, and/or advisors mentioned in this complaint.

22.    "C" Insurance Company is an insurance company incorporated under the laws of the Commonwealth of Puerto Rico and/or a place other than the Commonwealth of Puerto Rico, which issued a policy to cover some or all of the risks and/or occurrences incurred by Unknown Defendants, their employees, and/or other mentioned employees and/or advisors and or officers and directors mentioned or not still identified, in this complaint.

23.    Dr. Orlando Marini (hereinafter, "Marini") is the principal stockholder and chief executive officer of SISSO. All of SISSO's illegal or improper actions, affecting MEDHS, were performed under his direction. He was, in fact, one of the persons who, acting in SISSO's name, directly conspired with the remaining co-defendants to deprive MEDHS of its property and contractual rights, all the while acting in agreement with the state actors named above and, thus, under color of state law.

24.    MEDHS seeks injunctive relief and damages against Marini for his tortious interference with MEDHS contractual relations and for its conspiratorial actions committed in agreement with state actors, in violation of MEDHS' property rights.

25.     Mr. Jose Quiros (hereinafter, "Quiros") is the principal stockholder and person in effective control of MMC and Manati Med.  All of MMC and Manati Med's illegal or improper actions, affecting MEDHS, were performed under his direction.  He was, in fact, one of the persons who, acting in MMC and Manati Med's name, directly conspired with the remaining co-defendants to deprive MEDHS of its property and contractual rights, all while acting in agreement with the state actors named above and, thus, under color of state law.

26.     MEDHS seeks injunctive relief and damages against Quiros for his tortious interference with MEDHS contractual relations and for its conspiratorial actions committed in agreement with state actors, in violation of MEDHS' property rights.  His wife, included under the fictitious name of Mary Doe Quiros, for lack of knowledge of her real name, and their conjugal partnership of property are included to answer, financially, financially, for the damages that his unconstitutional and tortious actions have caused.

27.     Mr. John Doe and Richard Roe are unknown Defendants who are Municipality, SISSO, Manati Med or MMC's employees, collaborators, or attorneys, who acted with *scientier* and/or who entered into agreements with known co-defendants to deprive MEDHS of its property rights and/or interfere with its business relations or who, in fact, interfered with Debtor's business relations and/or falsely represented to third parties, government agencies included, that MMC is in possession.

### III.     FACTUAL BACKGROUND
(All prior paragraphs and all addenda and Exhibits attached to or filed simultaneously with this Complaint are hereby incorporated by reference and made an integral part of the pleadings.)

28.    On June 21, 2006, the Municipality published edicts, inviting proposals for the administration of its medical center.

29.    On July 21, 2006, MEDHS submitted a proposal for the lease and administration of the medical center.

30.    On December 18, 2006, the Mayor sent MEDHS a letter, advising MEDHS that of the two proposals submitted, in response to the invitation, MEDHS' proposal had been chosen to be further evaluated, by the Municipality's negotiation committee, with an eye to approving it and granting MEDHS the contract.

31.    On November 27, 2007, the Municipality's chief legal officer and president of the negotiation committee issued a letter to MEDHS, establishing some of the rules that would apply to the negotiations that would ensue.  From that time on, negotiations commenced, which lasted approximately, two years, during which numerous meetings were held and all documents required provided.  On December of that year, the specifications were supplied, for the equipments that were to be acquired, for the hospital, upon the change of administration.

32.    During that time, the corporate structure that the Municipality desired and was finally materialized in the contract, was conceived and developed.  The contract, as finally conceived, entailed the participation of two entities, on the side of the non-government parties.  One was to be MEDHS, the non-profit entity which would lease the premises and SISSO, a profit oriented corporation which would sub-lease and administer most of the facility.

33. Simultaneously, contacts were made and agreements reached with different medical groups, potential operators and service providers for the different specialized areas of service, at the facilities. Among those was Dr. Orlando Marini, who expressed an interest in assuming responsibility, for the cardiovascular area of the hospital.[2]

34. On December 5, 2007, Dr. Marini sent an e-mail specifying the equipment that would be acquired by him or by related parties for the Municipal Hospital.

35. On December 18, 2007, Dr. Marini causes three corporations, under his ownership and control, to send specific proposals where they represented that they would provide the funds necessary to acquire new equipment for the hospital's cardiovascular department. The entities were Cardio Services, Inc., Aguadilla Heart Center, Inc. and Diagnostic Nuclear Medicine.[3] The representations of said entities were a central part of the considerations upon which the final agreements between MEDHS and the Municipality and MEDHS and SISSO were based. When making the decisions to enter into both agreements and when determining what conditions were acceptable, MEDHS relied fully upon the representations of Dr. Marini and his corporations. The reliance on the latter's representations, of course, was fully dependent on the trust placed in the word and representations of their principal, Dr. Marini.

---

[2] See: Exhibit 1, letter of Dec. 17, 2007.

[3] See: Exhibits 2 and 3, letters of Dec. 17, 2007, from Aguadilla Heart Center and Diagnostic Nuclear Medicine, respectively.

36.     During the next fifteen months, the negotiations slowly progressed. On the 31st of March, 2009, Dr. Orestes Castellanos, acting for MEDHS, requested, from the Municipality, that it supply some sort of document or certification, attesting to the existence and state of the negotiations.[4] The reason was that financial institutions and medical groups needed to operate the different areas of specialty in the medical center required some sort of assurance that their commitments were in answer to a serious offer (Notwithstanding the need, the letter was not issued until August 20, 2009, days before the signing of the contract). On the 17th of July, though, an e-mail was sent by the Municipality, explaining what documents and compliances would be needed in order to make the closing possible. The e-mail also advised that SISSO would have to sign the contract, as a guarantor.[5]

37.     On August 4, 2009, Counsel Efrain de Jesus, Chief Legal Counsel for the Municipality, sent a letter to MEDHS. In it, he explained that, although a pre-agreement had been reached, to the effect that MEDHS would be the party with whom the Municipality would sign the lease, the contract had not been signed because a prior lessee continued in possession of the premises. He requested confirmation, from MEDHS, of its continued interest.[6]

38.     On August 10, 2009, Dr. Castellanos, acting for MEDHS, confirmed the interest.[7]

---

[4] See: Exhibit 4, e-mail of March 31, 2009.

[5] See: Exhibit 5, e-mail of July 17, 2009.

[6] See: Exhibit 6, letter of August 4, 2009.

[7] See: Exhibit 7, letter of August 10, 2009.

39.     Prior to the signing of the contract between MEDHS and the Municipality, Dr. Orestes Castellanos Rodriguez, Dr. Edwin Rodriguez Aponte and Mr. Pedro J. Montes Garcia, had been owners of the controlling interest of SISSO stock.  They had acquired that interest, among other reasons, because an entity of their ownership, Centro Imagenes del Oeste, had renounced, in MEDHS and SISSO's favor, to its claim to the radiology department of the hospital.  That department represented an approximate income of $1,500,000 per year.

40.     Shortly before they signed the contract with the Municipality, SISSO's controlling stockholders entered into an agreement with Dr. Marini.  In exchange for the controlling interest of SISSO (55%), Marini agreed to provide the total investment required by SISSO to commence and maintain operations until cash influx from said operations allowed the hospital, and SISSO, to become self sufficient.   In addition, the minority stockholders, in proportion to their equity, agreed to pay to Dr. Marini, in two years term, a total of $1,500,000, plus accumulated interest.  It was also agreed that if the payment was made during the first six months, it would be free of interest.  If the minority stockholders could not comply, or chose not to, it was further agreed, they would lose their equity interest in SISSO.

41.     On August 19, 2009, the Mayor notified MEDHS of his intention of granting MEDHS the contract.[8]  Included, with the letter, was a copy of the

---

[8] See: Exhibit 8, letter of August 19, 2009.

contract to be signed. Updated copies were sent on the 20th and 25th of August. The contract was finally signed on August the 27th.[9]

42.     Notwithstanding MEDHS repeated requests, the facilities were not delivered to MEDHS until August 31st. Allegedly, legal problems with the prior lessee impeded the prompt delivery. Upon receipt of the property, MEDHS, realized that a substantial part of the same was in a state of ruin and/or abandonment, apparently the result of unrealized plans, by the prior lessee, to redesign and modify the existing facility.[10] It appeared that the project was not finished, possibly for lack of funds, and the ruined facilities were never rebuilt. MEDHS had not previously entered the property, because the prior lessee would not allow it. The Municipality, though, as owner of the property, could enter to make inspections. Thus MEDHS and SISSO trusted the Municipality's explicit and/or tacit representations that it would deliver the whole hospital, in serviceable condition. At no time did the Municipality advise MEDHS of the true condition of the hospital.

43.     Faced with the situation, and MEDHS' demands, the municipal representatives, including attorneys Nieves and DeJesus, alleged lack of knowledge of the condition of the premises. The above allegation is very difficult to accept, since the Municipality, as owner of the property, had legal access to the premises at all times. MEDHS officers, though, decided to accept the Municipality's representations of ignorance, expecting that it would act decisively

---

[9] See: Exhibit 9, Contract between Municipality and MEDHS, where SISSO appears as guarantor.

[10] See: Exhibit 10, photos of abandoned and/or ruined portions of the hospital.

to cure the default. The Mayor was informed forthwith and, on the following week, a video was taken and a minute of the inspection was kept. An inventory, of the equipment in the facilities, was then taken by the Municipality. Said inventory was needed to obtain a number of insurance policies required by the contract. In spite of MEDHS recurring requests, the inventory, to this day has not been supplied.

44. Notwithstanding its own above described failure to supply the inventory, the Municipality, acting through its legal counsel, started demanding performances, from MEDHS, that required that, the Municipality, first supply the above, properly valued inventory. When confronted, by MEDHS, with this reality, the Municipality then raised the specter of the prior lessee and the difficulties that it caused, as an excuse to justify its inability to act.[11]

45. Meanwhile, the mayor gave a press conference, in which he announced, without consulting MEDHS or considering the contract, that the third floor of the hospital would be used for a trauma ward.[12]

46. On September 27, 2009, MEDHS advised the Municipality, through its counsel, Mr. Nieves, that the third floor was designated for the pediatric ward, which contract was being negotiated with appropriate groups. MEDHS proposed that the Municipality repair another floor, to provide adequate space. The Municipality was also informed that the layout of the emergency facilities, on the

---

[11] See: Exhibit 11, e-mail of Sept. 11, 2009, from the Municipality to MEDHS and MEDHS' answer, dated Sept. 12, 2009, included in reverse order, as kept by e-mail service..

[12] The public statement was, apparently, made to answer questions regarding lack of adequate medical facilities for the oncoming games.

ground, differed substantially from the layout reflected in the documents. The problem was serious because the actual layout produced inadequate operational conditions that put the hospital at risk of committing malpractice. MEDHS further advised the Municipality that it was willing to discuss possible changes to the contract.[13]

47.    Meanwhile, MEDHS received notice, from the IRS, that it had liens on all the equipment of the hospital. That was the first time that MEDHS had received such information, never having been advised of the fact by the Municipality. On September 30, MEDHS notified the Municipality of the above. MEDHS further informed that the above, and other misrepresentations of the Municipality regarding its capacity to deliver the property, were interfering with MEDHS efforts to obtain financing for the project. An urgent meeting was requested.[14]

48.    The meeting was held and, as a result, MEDHS issued a letter, dated October the 7th, proposing that, given that only three of the six floors of the hospital were usable, the rent be renegotiated.[15] On October 12, the Municipality answered, requesting written, specific proposals.[16]

49.    Meanwhile, on October 8, the Mayor and MEDHS signed an agreement with a financing group, naming said group as the entity that would obtain federal funds for the reconstruction of the hospital.[17]

---

[13] See: Exhibit 12, e-mail of Sept. 27, 2009.

[14] See: Exhibit 13, e-mail of Sept. 30, 2009.

[15] See: Exhibit14, e-mail of Oct. 7, 2009.

[16] See: Exhibit 15, e-mail of Oct. 12, 2009.

[17] See: Exhibit 16, Agreement [for] Designation of Representation.

50.     In the interim, SISSO requested, from the Municipality, an extension of time to file financial information.  The Municipality referred SISSO to Dr. Castellanos, as president of MEDHS, the contracting party.  SISSO was informed that any matter regarding the contract had to be handled through MEDHS.[18]  MEDHS, then, required from SISSO that it comply with the obligation to provide statistical and financial reports.[19]

51.     The above described incidents are important because they show that the Municipality and SISSO, at the time, fully understood the nature of their relationship and their rights and obligations under the applicable contracts.  Less than two months later, they and their principals would be acting in direct opposition to said understanding.

52.     While all this was going on, SISSO, allegedly, was trying to obtain the insurance policies required by the contracts.  Since the Municipality failed to supply the needed information, though, it had what seemed like a valid excuse.  SISSO, by the same token, failed to provide the insurers with financial information for one of the three related companies, owed by Dr. Marini and mentioned above.  The reason was that, as described above, Dr. Marini had committed said companies to supply, for SISSO's benefit, certain performances required by the contract.  It was a requirement, for insurance to be provided, that the information of the participants, be made available.  Apparently, because of the dual failure, the potential insurers advised SISSO that, under the

---

[18] See: Exhibit 17, Answer to "Request for Extension of Time to Submit Financial Reports".

[19] See: Exhibit 18, letter of Oct. 16, 2009.

circumstances, 100% cash collateral would be needed, for any policy to be issued.

53.    Also in this period, MEDHS advised the Municipality that it could not comply with the Mayor's desire that the third floor of the hospital be designated as a trauma ward. The reason, obviously, was that if it agreed, only two floors, out of six, would remain available and the project, as originally conceived, would not be possible. Other alternatives, directed towards complying with the Municipalities needs, were suggested. A meeting was set for October 28.

54.    On November 2, MEDHS submitted specific proposals for rent modification, including evidence (photos of the ruin) to support the proposal.[20]

55.    On November 6 a meeting was held, between MEDHS and the Municipality, to discuss the issues pending between the parties. The meeting resulted in written communication, by MEDHS and SISSO, to the Municipality, summarizing the results of the meeting.

56.    While this was going on, SISSO was attempting to impose upon MARC, one of the tenants that derived their leasehold rights directly from MEDHS, specifically the radiotherapy ward, a rent of $30,000. MARC refused to accept the attempted imposition, but agreed to subsidize SISSO for a total amount of no more than $30,000, to help finance the project. The offer was conditioned to the availability of the money. It was also agreed that MARC would pay its own proportional part of the utility costs, but it was stressed that the

---

[20] In fact, the evidence was not necessary. As stated in the text, the Municipality performed an inspection of the premises of the hospital, took a video and drafted a minute of the findings.

concept was payment of proportional expenses, not rent. It was also made very clear that MARC's contract was with MEDHS, not SISSO, and that any negotiations or agreements, that affected MARC's rights, would be performed by MARC or needed MARC's prior, specific approval.

57.     On the 13th of November, Dr. Marini advised his minority stockholders that there was a cash shortage allegedly because the health insurance plans were not paying on schedule. According to Dr. Marini, the shortage would necessarily result on default with the obligations to the Municipality. He alleged that he had invested the total amount that he had agreed to and that he had no more money. He then proposed that the minority stockholders turn over their stock to him. He would then capitalize the corporation so that he could then use the total equity to raise the necessary capital to save the enterprise. On those terms, an agreement was reached between Dr. Marini, SISSO's majority stockholder and Drs. Orestes Castellanos and Edwin Rodriguez and Mr. Pedro Montes Garcia, SISSO's three minority shareholders, who, based in Marini's representations turned over their 45% interest in SISSO.[21]

58.     During this time and also based on Dr. Marini's representations, an additional, informal, temporary, agreement was reached, between MEDHS and SISSO. It was an additional attempt to capitalize and/or subsidize SISSO. Specifically, SISSO would pay MEDHS' rent directly to the Municipality, instead of paying its own rent to MEDHS and let MEDHS pay its own rent. The

---

[21] See Exhibit 19, letter of November 13, 2009, signed by SISSO's minority stockholders, addressed to Dr. Marini, in which the signatories confirm the transfer of their ownership interest.

advantage to SISSO was that the rent that SISSO had to pay MEDHS was higher than the one that MEDHS had to pay to the Municipality. Thus, SISSO obtained a real economic advantage. Other advantages were the turnover to SISSO of MARC's principals control of the radiology department and MEDHS' allowing SISSO to exploit the parking until further notice.

59.   The agreements described in the three previous paragraphs constitute the parties adjustments to the conditions "on the ground" and illustrate the good faith attempts, made by MARC, MEDHS and Drs. Castellanos, and Rodriguez and Mr. Montez, to help SISSO and/or not impede its efforts to move the project forward.

60.   Little did they know that SISSO had collectibles of close to $6,000,000, which could have been used as guarantee to raise money, without their having to relinquish their interest in SISSO. Neither did they know of the advanced state of the negotiations between Marini, the Municipality and the Quiros group, to sell SISSO at a profit and get rid of MEDHS and MARC.

61.   On December 1, 2009, MEDHS received a visit by municipal officers, demanding the payment of rent due. The Municipality's officers explained that the check for $75,000 that had been tendered by SISSO had been returned thrice, for lack of funds.[22] After that happened, SISSO, made an effort to conceal the true nature of the incident and placed a "stop payment" order on the check.

---

[22] See Exhibit 20, "bounced" check and Municipality's letter returning it.

62.     SISSO also failed to comply with the reporting obligation established in the contract, specifically the financial reports due on the fifteenth of every month.

63.     Both of the above noncompliances were addressed in written communications dated December 1, 2009, sent by MEDHS to SISSO.[23] Specifically, SISSO was advised, verbally and/or in writing of the need to comply with the contracts and the damage that could follow, as a result of SISSO's non-compliance.

64.     On the following day, Mr. Ramfis Velez, acting in SISSO's name, sent a letter to MARC, demanding a payment of $150,000 in rent, allegedly due, and demanding that MARC vacate the premises on or before the 15th of December.[24]  From that moment on, it was clear that SISSO's agenda ran contrary to its contract with MEDHS.  That same day, Dr. Castellanos, acting as CEO of MARC, answered SISSO's letter, reaffirming that MARC had no contract with SISSO, owed no rent and could not be evicted by SISSO.[25]

65.     On December 7, 2009, Mr. Ramfis Velez, again acting in SISSO's name, sent a letter to MEDHS, explaining that it did not have to pay rent because during a meeting with the Mayor, it had been agreed that rent would not be paid by MEDHS to the Municipality, for "a reasonable period of time".  Thus, alleged Counsel Velez, SISSO did not have to pay rent to MEDHS.  No explanation was provided as to why SISSO would not have to pay rent to its landlord, MEDHS.

---

[23] See Exhibit 21, letter of Dec. 1, 2009.

[24] See Exhibit 22, letter of Dec. 2, 2009.

[25] See Exhibit 23, letter of Dec. 3, 2009.

66.     Notwithstanding SISSO's representations, on December 8 the Municipality, acting through its counsel, Mr. Carlos Nieves, sent a letter to MEDHS, demanding payment of the rent due and making reference to SISSO's bounced check.  Fifteen days were granted as maximum term to cure the default.[26]  On that same day, MEDHS answered Counsel Velez's letter and reaffirmed that no agreements had been reached with the Mayor, in the terms described by Velez in his letter.  Again, SISSO was reminded that its contract was with MEDHS and that MEDHS had not condoned any payments or the compliance with any of the terms of the relevant contracts.  Again, SISSO was advised of the risks and damages to which MEDHS was being submitted, by SISSO's behavior.[27]  A copy of the Municipality's payment demand letter was included and SISSO was advised that it was granted the same terms as MEDHS, to comply.

67.     On December 30, a letter was sent to Counsel Velez, of SISSO, by MEDHS, summarizing the prior letters and MEHDS' position and presenting an invoice for the rent owed to MEDHS by SISSO.[28]

68.     On January 4, 2010, attorney Cesar Miranda, advisor to the Mayor, called Dr. Castellanos and informed him that, behind MEDHS back, Marini, acting on his own and on behalf of his herein named corporations, including SISSO, Mr. Jose Quiros (hereinafter, "Quiros "), acting on his own and on behalf of his corporation, Manati Medical Center, and the Mayor of Mayaguez had met

---

[26] See Exhibit 24, letter of Dec. 8, 2009, from the Municipality's legal counsel to MEDHS.

[27] See Exhibit 25, letter of Dec. 8, 2009, from MEDHS to SISSO.

[28] See Exhibit 26, letter of Dec. 30, 2009, from MEDHS to SISSO.

to discuss the acquisition of SISSO, by Quiros, and the future of the medical center.

69.     At said meeting, it was made to appear, the Municipality had agreed with Quiros and Marini to grant SISSO several months of rent and utilities moratorium.   Meanwhile, the Municipality, acting under the orders of the mayor, continued to demand rent payments and other compliances from MEDHS.  Since SISSO's main obligation was to MEDHS, not the Municipality, the so called moratorium appeared to be only an invitation to SISSO, to default on its obligations.  The "umbrella" of exemption from payment apparently only covered SISSO.  Thus, its failure to comply with its guarantees under the lease would not affect SISSO, financially, nor disqualify it as a successor to MEDHS.  MEDHS, though, lacking the resource represented by SISSO's rent would necessarily default in its rent obligation to the Municipality.  Said appearances placed MEDHS and its principals, as well as MARC and its principals, in a position of great weakness for the forthcoming negotiation.

70.     It was made to appear that SISSO could default in its obligation to MEDHS and the Municipality would hold it harmless.  Meanwhile, specific performance was demanded from MEDHS, under penalty of cancellation. MEDHS depended on SISSO to pay the rent and to supply the documentary performances required by the contract, in order to be able to meet its obligations to the Municipality.  The result of the successful implementation of the scheme could be only one.  MEDHS appeared unable to comply with the contract and cancellation could be expected.  MEHDS and its sub-lessees could expect to be

evicted and supplanted by SISSO or its successor. MEDHS and MARC's only recourse would be to sue, an undesirable prospect, at best.

71. SISSO's apparent hold over MEDHS' jugular vein made its position stronger and more valuable. Its apparent power to cause the eviction of MEDHS and its sub-lessees made SISSO more valuable to potential successors, like MMC and/or other Quiros related companies. With the value maximized, SISSO or, more correctly, Dr. Marini could then turn and sell the whole thing, at a profit, to Mr. Quiros and/or one of his corporations. He did, at a profit of $1,300,000.

72. Dr. Castellanos immediately requested a meeting with Dr. Marini. Dr. Marini agreed, but conditioned the acceptance to the meeting being held at the Mayor counsel's office. The meeting was held on January 5, 2010. At the meeting, were present the representatives of the Municipality, of Dr. Marini and his corporations, including SISSO, of Mr. Quiros and his corporation, Manati Medical Center, and the representatives of MEDHS.

73. At the meeting, Counsel Cesar Miranda, advisor to the Mayor, confirmed that during the month of December, the Mayor and he had met with Dr. Marini and his representatives and Mr. Quiros and his people. During said meeting, they had reached certain agreements regarding the future administration of SISSO and the administration of the medical center, as such. Present at the January 5 meeting was Counsel Kermit Ortiz, representative of Mr. Quiros and his corporations. Upon being questioned, by Dr. Castellanos, as to his identity and reason for his presence, Counsel Kermit Ortiz explained that his principals had met with Marini and the Mayor, during the month of December.

He then, basically, confirmed the assertions of Counsel Miranda, the mayor's advisor. He further described the transaction, as one by means of which Quiros and/or his corporations would acquire the stock of SISSO, for approximately $4,000,000, for which amount, financing arrangements had been made.

74. Counsel Kermit Ortiz was very adamant in his position that Mr. Quiros and/or Manati Med. had reached firm agreements with Dr. Marini and the Mayor to the effect that his clients would start operating the medical center forthwith. Furthermore, he advised, it was necessary for MARC, the group that managed the hospital's radiotherapy department, to vacate the premises without delay. It was so, because the Quiros group had already come to agreement with another group, to operate the hospital's radiotherapy department. Moreover, he stated, the Quiros group would not pay one cent, for said facility, for which payment the financial arrangements did not provide.

75. All the above was stated by Counsel Ortiz, Quiros' representative, in the presence of Counsel Miranda, the Mayor's representative and Dr. Marini. They did not deny or amend any of Counsel Ortiz' assertions and appeared to be in agreement.

76. When MEHDS representatives stood up to leave, Dr. Marini's representatives offered $400,000, in exchange for control of MEDHS and MARC's relinquishing of its leasehold. The offer was declined. Upon being informed of the state of affairs, the Mayor's representative, Counsel Miranda, who had been outside the room at the time, came into the room shouting that nobody could leave without an agreement. He further stated that, if MEDHS and

MARC did not agree, he would ensure that the Mayor declared some sort of social interest motive and set aside the contract with MEDHS. MEDHS refused to accept.

77. On January 19, 2010, at a meeting in Counsel Kermit Ortiz' office, Counsel Ortiz again insisted that MEDHS and MARC should accept Dr.Marini's offer because Quiros, Marini and the Mayor (or their representatives or nominees) had already signed a contract providing that Quiros would assume control of the Hospital on January 1, 2010. If the offer was not accepted, MEDHS and MARC would be evicted.

78. Further attempts, by MEDHS, to set things right were to no avail. The Quiros and Marini groups insisted in their position that MEDHS and MARC accept Marini's offer and relinquish the facilities. Several days later SISSO, in total disregard of its obligations and, apparently in order to advance the scheme to grant control of the medical center to Mr. Quiros an/or his companies, failed to supply materials for the hospital. The faculty, as could be expected, complained. The Mayor then used the excuse to notify his intent to cancel the contract with MEDHS. On January 28, 2010 defendant Jose Guillermo Rodriguez, in his capacity as major of the Municipality of Mayaguez, addressed a letter to MEDHS stating his intent to cancel the contract for lack of payment and had it delivered by messenger on the 29th.[29]

79. Pursuant to the letter mentioned above, the Municipality informed MEDHS that it terminated the contact between the parties under alleged violation

---

[29] See Exhibit 27, Cancellation Letter of January 8, 2010.

to sections 5.3, 6.2.2, 8.5(a)1 and 8.5(a)2 of the contract. Thus, the municipality requested to MEDHS the immediate surrender of the medical facilities, all allegedly pursuant to section 10.2 of the contract.

80.    The letter was in violation to sections 13.1.1 and 14.2 of the contract. The Municipality totally ignored the mechanisms created in the contract to solve in good faith the disputes between the parties. Also, the letter was not delivered to the address established in section 14.2 of the contract, but instead by messenger to the office of Dr. Castellanos. Dr. Castellanos was forced to wait until Monday February 1st, 2010 in order to deliver MEDHS' response to the letter delivered by the Municipality.

81.    On January 29th, 2010, SISSO Dr. Marini, speaking for SISSO and, without authority, for MEDHS, delivered a response to the Municipality. In his letter, Dr. Marini stated that SISSO and MEDHS had not complied with the contract because they didn't have the financial capability to finance the operation of the Medical Center.

82.    SISSO's president then accepted the termination of the contract by the Municipality. No mention was made, of the serious noncompliance, by the Municipality, which failed to deliver three out of six floors of the hospital and then decided to take back an additional floor for its much vaunted trauma ward. Neither did he mention the rent moratorium granted to SISSO/MMC and MEDHS, but denied in letters to MEDHS.[30]

83.    The actions of SISSO's president, Dr. Marini, can be explained by

---

[30] See Exhibit 28, SISSO's letter of January 29, 2010, accepting the cancellation.

the fact that he entered into an agreement to sell his stock to MMC and transfer to it the operation and administration of the hospital in exchange for $4,300,000. SISSO's agreement with MMC has been negotiated before December 28th, 2009, as evidenced by Exhibit C of the contract signed by the Municipality and MMC on January 28th, 2010.[31] Said proposal letter was received and accepted by the Municipality on December 28, 2009. Besides the forth coming sale, the letter also evidences a number of other facts and agreements, essential to understand this case and put it in its proper perspective.

84.     **The first essential fact is that an agreement had, after all, been reached granting SISSO, its new owner MMC <u>and MEDHS</u> a six months moratorium of payment. Thus, all representations made to MEDHS during that time period (and recently to the Court) to the effect that its rent was in arrears, were outright lies.**

85.     **The second essential fact is that MMC assumed control of SISSO and the administration of the hospital effective January 1, 2010. That includes assuming direct responsibility for all of SISSO's outstanding debts and obligations which emanate from its effective control of the hospital. After that date, any and all derelictions or intentional non-compliances committed by SISSO which may have served as an excuse for the Municipality's cancelation letter were the direct result of MMC's intentional failure to comply with its contractual obligations. It was not only SISSO, but MMC, who failed to maintain the hospital operating**

---

[31] See Exhibit 29, Proposal exhibit "C" of the January 29, 2010, Contract between the Municipality and MMC.

properly and therefore, the responsibility for whatever results followed falls totally on their laps.

86.    The third essential fact is that the Mayor signed, in approval, MMC's proposal letter.  Thus, he fully understood the above facts.  Yet, he had his representatives present MEDHS with a cancellation letter asserting lack of payment as the reason.  He then signed a new contract, on January 29, 2010, with the parties completely responsible for the alleged violations. The whole thing was of course a charade, for the moratoria had been accepted, was in effect and no rent was in arrears.

87.    The fourth essential fact is that SISSO's letter accepting cancellation[32] was also a charade, designed to give the above described travesty a patina of respectability.  Dr. Marini lent himself to sign a letter as president of SISSO, accepting the cancellation of its contract while MMC was had been in control of SISSO for a month and had signed an agreement to cure all defaults.  More important, the agreement provided for SISSO to remain as administrator of the hospital, which clearly contradicts the supposed cancellation.  Last, but not least, the lease contract was between Municipality and MEDHS.  SISSO was only a guarantor.

88.    The fifth essential fact, evidenced by the proposal letter, is that MEDHS and MARC are not the only victims of MMC and its agent's prevarication.  Its "partners in crime" are also lied to and mislead.  In the December 28 letter, MMC falsely represented to the mayor, that it had

---

[32] See Exhibit 28 of this Complaint.

MEDHS' directors' agreement to resign their positions and name directors of MMC's choosing. No such agreement was ever granted. It also falsely represented to the Mayor that MEDHS, together with SISSO and MMC, was requesting the approval of the transfer and of the payment moratorium. At the time the proposal letter was written and presented, MEDHS was not privy to its contents nor to the underlying negotiations and preliminary agreements that led to it. It could not have granted its acquiescence to any of its content and it didn't. Although it eventually accepted the moratorium, given the lack of payment by SISSO, what MEDHS wanted was compliance. Neither did MEDHS or its directors authorize MMC or its legal representative to represent them before the Municipality.

89. On the 1st day of February, 2010, MEDHS presented its response to the cancellation letter. It was penned by MEDHS' counsel Mr. Harry Padilla. In it, MEDHS, in contrast with SISSO, clearly indicated its position, that the only parties in violation of the contract were the Municipality and SISSO. In accordance with the dispute clause of the contract, MEDHS invited the Municipality to reconsider its position because it was illegal and contrary to the contract.[33]

90. Since November 2009, SISSO has failed to pay any rent installments to MEDHS. It has also failed to meet all other clauses of its contract with MEDHS including payment of utilities. As a result, MEDHS has not been able to meet any of its obligations.

---

[33] See Exhibit 30, MEDHS's letter of February 1, 2010.

91.     Meanwhile, control over SISSO was obtained by Quiros or one of his corporations. MMC, then signed a contract with the Municipality to lease the same facilities that were still under lease to MEDHS and started operating them under the licenses and certificates jointly owned by the Municipality, as owner, MEDHS as lessor and SISSO as administrator. In a literal pattern of duplicity, MMC represents itself, before the Municipality, the bankruptcy court and others, as a corporation acting under new contracts and deriving its rights to administer the medical center pursuant to the new contract. Simultaneously, it represents itself as SISSO, before health insurance companies and Medicare and their payments come in SISSO's name and are deposited in SISSO's accounts. Its employees are paid in SISSO's name and, presumably, payroll taxes follow the same course.

92.     To our understanding, the reason for the duplicity is economic. Quiros and/or his companies could have simply waited until SISSO's pre-arranged default had given the Municipality the excuse to evict both SISSO and MEDHS. Once they had been evicted, Quiros and his companies could have then negotiated a new contract with the Municipality. That more prudent course of action, though, would have made the deal extremely expensive and protracted. In the first instance, they would have been forced to compete with other potential lessees and administrators. That would take time and money and there would be no assurance of success. Then, licenses and other compliances would have had to be obtained and met. That would entail an additional wait and expense. So, what appears to have happened in fact, if not in form is that they

bought SISSO, capitalized it and continued operating it, "doing business as" MMC.

93.    If they had been straight about it, though, they would have been forced to honor SISSO's contract with MEDHS and respect MEDHS' contract with MARC. If, by contrast, they represent themselves as MMC, a new company with a new contract, they can evict, or so they believe, MEDHS and MARC.

94.    So, in order to give the whole scheme a glaze of legitimacy, SISSO's default was arranged, to force MEDHS to default. Pursuant to the plan, SISSO sent the mayor the nice letter, explaining its inability to raise capital and surrendering the contract that wasn't it's to surrender. In the same spirit as the acquisition of Manhattan, by the English, in colonial times, the mayor accepted the surrender, ignored the underlying contractual reality, forgot SISSO's debt and signed a contract with MMC.

95.    Once the new contract was signed, MMC did not stand still, on the matter of the licenses. Obviously conscious that it was treading on thin ice, MMC, acting through Counsel Antonio J. Santos presented, to the Health Secretary, request for cancellation of MEDHS Certificates of Need and Convenience and Licenses to operate. The requests were based on the representation of change of control at SISSO. The change of control where upon MMC is also referred to. No information was conveyed regarding the conditions of the alleged change of administration. MEDHS was not notified of the filing, even though Counsel Santos signed the MMC/ Municipality contract

and must have been conscious of the contents of Exhibit "C" of said contract. (See Exhibit 29).

96.    But it was all, and still is, smoke and mirrors.  As described above, it is SISSO that continues operating the hospital facilities.  The reason is that the licenses and certificates are in its name and changing them would entail a long wait and great expense.  Meanwhile, no services could be rendered, no Medicare patients treated and no money would come in.  So, the sham transactions are put in place, while SISSO keeps on doing business as usual and MEDHS is defrauded of its rent and opportunities to develop its plans to create an educational hospital facility at Mayaguez.[34]

97.    As stated above MEDHS purpose, as an institution, is to develop medical/educational facilities and programs directed towards increasing the general level of health within the Mayaguez area.  To said effects, consultants were hired and people and institutions were contacted.  Presentations were made to government agencies that could provide funds to finance MEDHS educational goals.  All of it was based on MEDHS's control of the institution where the essential educational activity would take place.  The institutions, agencies and programs that were approached, naturally, needed to visit the facilities, as part of their due diligence investigation.  They had to determine if the facilities in which the proposed programs were to be developed and/or put in practice, actually existed and was available.  When visits were announced, or made, related to the above, SISSO/MMC personnel advised the visitors that they

_____

[34] It is possible that, at this time, new license and Certificate have been issued as requested by MMC/SISSO.

were in control of the hospital and not MEDHS or Dr. Castellanos. They were further advised that there was no interest in the programs or funds related to the visits.

98.     As a result of SISSO/MMC's above described conduct, MEDHS has lost countless opportunities to obtain grants and participation in beneficial programs. It has also lost the investment in plans, advice, public relations, and consultants and executive's time, directed towards the obtaining said funds or benefits for MEDHS, for the hospital and for the community.

99.     More important, perhaps, it has lost the public trust it enjoyed. It has been made to look as an untrustworthy institution that falsely represents its potentialities, its assets and its capabilities. Thus, its capacity to perform its role has been substantially diminished, if not totally eradicated.

### IV.     FIRST CAUSE OF ACTION-BREACH OF CONTRACT
(All prior and subsequent paragraphs and all addenda and Exhibits attached to or filed simultaneously with this Complaint are hereby incorporated by reference and made an integral part of the pleadings.)

100.    The Civil Code provides that the aggrieved party in a case of contract violations can demand, from the guilty party, specific performance and damages or, if it so chooses, can cancel the contract and demand reparation. In the present case, the Municipality failed to deliver the property, as represented. Out of six floors, three were in a state of ruin. Repeated claims to the Municipality were met with nothing but posturing. No attempt to cure the problem was made. No specific offers, to reduce the rent and/or other specific benefit, to compensate for the inadequate compliance, were ever made. In addition, the Mayor then demanded that an additional floor be surrendered, to

34

serve as a trauma ward, further detracting from the economic and operational viability of the project. MEDHS capacity to carry the project to a successful end was also impaired by the effect that the withdrawal of an additional floor had on the confidence of the possible participants and of the financial community.

101. The loss of more than 50% of the available area (plus the trauma ward) has a result that is more damaging than simply a loss of gross income. The loss of economies of scale and the loss of the attractiveness of an opportunity to set an operation in a complete, physically attractive, hospital mean less income and more expense per square foot for the operator. Said losses are all the direct result of the Municipality's non-compliance with the terms of the contract added to its unwillingness to provide cure or compensation in the form of better terms.

102. MEDHS prays that this Honorable Court enter judgment enforcing strict compliance with the terms of the contract, ordering the Municipality to repair the facilities object of the contract and deliver them to MEDHS, as agreed. It also prays that damages for noncompliance with the terms of the contract be granted in the amount of $3,000,000, for the time already elapsed, which amount will augment with every day that passes at a rate of $10,000 for every day that passes and the hospital facilities are not delivered in full usable condition or until the contract is declared resolved by MEDHS, at which time the full value, as describe below, should be paid.

## V.　SECOND CAUSE OF ACTION-FRAUD OR DECEIT ("DOLO") WHILE INDUCING PLAINTIFF TO AGREE TO THE TERMS OF THE CONTRACT

(All prior and subsequent paragraphs and all addenda and Exhibits attached to or filed simultaneously with this Complaint are hereby incorporated by reference and made an integral part of the pleadings.)

103.    The Municipalities actions were performed with full knowledge of the facts and the damages that its misrepresentations would cause. It knowingly published an edict asking for proposals to administer the municipal medical center, without advising bidders that the hospital was in ruinous condition. It further negotiated with MEDHS for over a year, never advising MEDHS of the true condition of the hospital. Such behavior constitutes fraud or "dolo grave". When presented with MEDHS claims, the Municipality failed to act or, in any way attempt to correct the situation or compensate MEDHS. Such failure makes the municipality answerable for the additional responsibility provided by the Civil law for those who are guilty of knowingly and intentionally, misleading others into agreements that are based on untruths. To those apply the more demanding strictures of the law, applicable to cases where "dolo contractual" permeates the guilty behavior. If proven to the Court's satisfaction, "dolo grave" can serve as a basis to invalidate the contract and grant damages or, if possible and if the victim so chooses, to enforce specific compliance and grant damages.

104.    MEDHS prays from this Honorable Court that, if it finds that the physical condition of the facility is such that it is impossible to fix and to deliver the property in full usable condition, that it grant as damages, against the Municipality, the full amount of expected earnings for the full life of the contract. That is, $54,000,000, adjusted to present value, at the time of the payment.

## VI.    THIRD CAUSE OF ACTION-DAMAGES INCIDENTAL TO CONTRACT, AND/OR IN TORT

(All prior and subsequent paragraphs and all addenda and Exhibits attached to or filed simultaneously with this Complaint are hereby incorporated by reference and made an integral part of the pleadings.)

105. The above described actions, involved different parties at different points in time. Some were victims for a time and guilty for the rest of the time. Their different interactions, taken together, cause the sum total of the damages suffered by MEDHS. Some violations were contractual in their nature, like those described above. Others were of a tortious nature. They cannot be easily separated, if at all. The manner in which the various guilty conducts interacted had a result which is worse than the sum of their parts.

106. Thus, if Quiros had not proposed to take over the facility, dealing behind MEDHS back and to its detriment, the Municipality might have faced the need to repair the facility and made MEDHS whole. Or it might have offered some solace in the way of better terms in the contract. Perhaps, faced with its contractual obligations and seeing no way out, SISSO and/or Marini might have joined forces with MEDHS, to force the Municipality to act as suggested above. As it was, Quiros and his companies appeared as pseudo white knights, offering a solution to the Municipality, at no expense, and a quick profit to Marini. All that was required was that they all join and sacrifice MEDHS and MARC.

107. The above described condition can only be characterized as an intentional joining, a conspiring, to deprive MEDHS and its lessee, MARC of their leasehold and other rights under their respective contracts. The parties must answer jointly, for all the damages caused to MEDHS, as a result of their actions.

108.    MEDHS prays from the Honorable Court that it enter judgment

against all defendants, *in solido,* condemning them all to pay MEDHS losses as

above described: if the property is repaired and delivered to MEDHS in proper

condition, $!0,000 per day, from the time that they conspired to deprive MEDHS

of its contract rights until it is made whole; if the property is not repaired and

delivered and the contract must be resolved, the full amount of $54,000,000,

corresponding to rent that should have been received.  Adjusted to the moment

the amount is paid, after projected expenses are deducted.

### VII.    FOURTH CAUSE OF ACTION-DAMAGES INCIDENTAL TO TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR BUSINESS RELATION
(All prior and subsequent paragraphs and all addenda and Exhibits
attached to or filed simultaneously with this Complaint are hereby
incorporated by reference and made an integral part of the pleadings.)

109.    SISSO and its principal stockholder, Dr. Marini, acting behind

MEDHS' back, dealt directly with the Municipality, to undermine MEDHS' relation

and its contract with the Municipality.  They achieved their goal.

110.    Mr. Quiros and his corporations, Manati Med. and MMC dealt

directly with the Municipality, its Mayor, Marini and SISSO, to undermine MEDHS

contractual and leasehold rights.  When faced with the existence of MEDHS, as

owner of the contracts with the Municipality and with SISSO, Quiros and/or his

companies went forth with their contract.  They knowingly refused to withdraw or

deal directly with MEDHS.  When faced with MEDHS' and MARC's

unwillingness to relinquish their  rights for a pittance, instead of cancelling its

contract with the other guilty parties, Quiros acting through his agents insisted in

their disposing of MEDHS and MARC, promising to solve all their problems and leave them with a profit, if they did so.

111.    Their actions constitute a tort known as "tortious interference with business, or contractual, relations". They are directly responsible for the Municipality's decision of getting rid of MEDHS and MARC, instead of curing its failure to deliver the property in proper condition, as was reasonably expected. They all must answer jointly, for the damages they have caused.

112.    MEDHS prays from the Honorable Court that it enter judgment against all defendants, *in solido,* condemning them all to pay MEDHS losses as above described: if the property is repaired and delivered to MEDHS in proper condition, $!0,000 per day, from the time that they conspired to deprive MEDHS of its contract rights until MEDHS  is made whole; if the property is not repaired and delivered and the contract must be resolved, then MEDHS prays that co-defendants be condemned to pay the full amount of $54,000,000, adjusted to the moment the amount is paid, after deducting projected expenses.

### VIII.    FIFTH CAUSE OF ACTION- DAMAGES FOR VIOLATION OF CIVIL RIGHTS: ATTEMPT TO DEPRIVE MEDHS OF PROPERTY WITHOUT DUE PROCES OF LAW
(All prior and subsequent paragraphs and all addenda and Exhibits attached to or filed simultaneously with this Complaint are hereby incorporated by reference and made an integral part of the pleadings.)

113.    The joint actions, performed by co-defendants constitute an attempt to deprive MEDHS of its property rights, without the benefit of due process of law.  It is so because the relevant actions were performed by state actors, the Municipality and its Mayor and associates, acting under color of state law, but, in fact, acting in a manner contrary to law.  Their actions, performed under

knowingly false pretenses, were directed to deprive MEDHS of its rights. The

remaining actors acted jointly with the state actors, with common intent. That,

under civil rights law, 42 U.S.C. sec.1983, et sec, makes them state actors and

subject to the remedies and penalties provided by said law, including costs of

litigation and attorney fees.

114.    MEDHS prays from this Honorable Court that it find that co-

defendants acted jointly to deprive MEDHS of its rights, the private parties all in

common agreement with the named state actors and thus are subject to the

penalties provided by 18 USC 1983, et sec, including punitive damages, attorney

fees and costs of litigation. Thus, it is respectfully prayed that this Honorable

Court condemn all codefendants to pay, *in solido,* all the amounts claimed above,

as compensation for the previous causes of action, plus punitive damages,

interests, costs, litigation expenses and lawyer fees, determined by the "lodestar"

method, as provided by the cited sections of the law and applicable

jurisprudence.

### IX.    SIXTH CAUSE OF ACTION-INJUNCTION-CEASE AND DESIST AND SPECIFIC PERFORMANCE
(All prior and subsequent paragraphs and all addenda and Exhibits attached to or filed simultaneously with this Complaint are hereby incorporated by reference and made an integral part of the pleadings.)

115.    The contract between MEDHS and the Municipality was the result

of a public policy decision which was in accordance with the enabling law of the

Municipality and the public policy of the Commonwealth of Puerto Rico. The

breaking of the contract operates against said policy and constitutes a dereliction

of duty by the Mayor and a violation of law, by the Municipality. Complying with

the law and the terms of the contract constitutes a ministerial duty and, in failing to comply, the Mayor becomes the valid subject of the injunctive power of the Court.

116.   MMC or a party related to MMC which acts in connivance with it, is the owner of all of SISSO's stock and in effective control of the same.  It derives whatever rights it has to operate such an institution from the exploitation of SISSO and MEDHS's licenses and has continued the operation of the hospital in SISSO's name, walking into SISSO's shoes.  It offers its services to insurance companies in SISSO's name, gets paid in SISSO's name, deposits its funds in accounts in SISSO's name and pays its employees in SISSO's name.

117.   SISSO/MMC operated the hospital under licenses issued to a hospital property of the Municipality, leased by MEDHS and sub-leased to SISSO.  The three go together and all representations to health insurance companies or to the Federal Government must include said licenses as the legal authority to operate as a health provider.  Yet, SISSO/MMC, with the connivance of its/their principals and related companies and of the mayor and Municipality of Mayaguez, represented itself as the lessee of the hospital, substituting itself for MEDHS, when representing itself before this Honorable Bankruptcy Court and the Commonwealth's Superior Courts.

118.   The above described actions constituted an usurpation of MEDHS' licenses and certifications, since SISSO derives whatever right it has to the hospital, from MEDHS.  They also constitute misrepresentations to Federal and Commonwealth's courts, as to SISSO/MMC's true relation to MEDHS, the

Municipality and its claim to the hospital facilities. Alternatively, they constitute a misrepresentation to Medicare and the health insurance companies as to their ownership of the licenses and certifications needed to operate the hospital and to qualify as health service providers to said governmental and private entities.

119. The misrepresentations have gone further. MMC misrepresented to the Health Department of the Commonwealth, that it is the lessee of the hospital facility, without bothering to provide the essential fact of the unresolved situation with MEDHS. It then requested that the Certificate of Need and Convenience, issued to the name of the Municipality, MEDHS and SISSO be cancelled and a new one be issued to the Municipality MMC and SISSO.[35] All this was done without giving notice to MEDHS of the ongoing proceedings. Said mis-representations are presently endangering the approval of the reorganization plan of MEDHS' lessee at the hospital, MARC, which must not be allowed.

120. MEDHS prays from this Honorable Court that it enter judgment ordering all co-defendants to cease and desist from the above described pattern of conduct, be it jointly or severally, as applicable. MEDHS also prays from this Honorable Court that it enter judgment enjoining defendants, *in solido*, from interfering with MEDHS lease and property rights, as well as those of MARC, its sub-lessee. Finally, it prays that it Issue a preliminary, provisional and permanent injunction, ordering Municipality to perform specifically with the terms of its contract with Plaintiff.

---

[35] See Exhibit 31, Letter by Attorney Antonio Santos, dated February 16, 2010 advising the Health Secretary of change of control and requesting transfer of licenses.

## X.  SEVENTH CAUSE OF ACTION-TURNOVER OF PROPERTY AND/OR COLLECTION OF RENT

(All prior and subsequent paragraphs and all addenda and Exhibits attached to or filed simultaneously with this Complaint are hereby incorporated by reference and made an integral part of the pleadings.)

121.   The contract between MEDHS and SISSO provides for the payment of monthly rent of $83,333.33.  To this day, SISSO has failed to pay rent as it comes due and presently owes MEDHS rent since the month of November, 2009, inclusive, which rent accumulates, day to day.  There is no disagreement between the parties, as to the truth of the above statement.  Thus, the rent outstanding is property of the estate, being improperly held by a third party and subject to the jurisdiction of this Court.  The accumulated rent is $992,708.45, plus interest of $35,416.70.

122.   In addition, SISSO was obliged to pay utilities, on a monthly basis. The utilities were billed as a unit, for the whole Health Center.  Thus, they need to be distributed and billed separately by the Municipality.  Said expense is calculated to $2,335,453.70, as of today.

123.   MEDHS, meanwhile, has been driven to file bankruptcy and, if the contract is not timely enforced by this Honorable Court, it will be unable to reorganize successfully, will cease to be a viable operation and will disappear as an entity.  Such failure constitutes irreparable damage, for injunction purposes. *Semmes Motors, Inc. v. Ford Motor Company*, 429 F.2d 1197

124.   The facts and events alleged and evidenced in this Complaint give Plaintiff a right to demand specific performance, plus damages.  Furthermore, said facts and evidence make it probable that Plaintiff will prevail in this action.  A

protracted proceeding, even if successful, will not provide an adequate remedy, because time, without the income that should be provided by the performance of the contract by the Municipality and SISSO, will most probably drive Plaintiff to ruin. MEDHS avers that that is precisely co-defendants' intent. It should not be allowed.

125.   Being the successor in interest of SISSO, or its alter ego, as the case may be, MMC is answerable to MEDHS for the outstanding and future rent, due to MEDHS by SISSO of its successor, as the case may be. It is also illegally holding funds, belonging to MEDHS, corresponding to the unpaid SISSO rent, in the amounts alleged above, plus utilities, as estimated above.

126.   MEDHS prays to this Honorable Court that it order SISSO and/or its alter ego, MMC, to deliver to MEDHS the funds it is improperly retaining, resulting from rent due, plus damages, in the form of interest and attorney fees, for the intentional violation of the contract, as provided by the Civil code for cases of "dolo contractual".

127.   Alternatively, MEDHS prays that the Honorable Court condemn SISSO and MMC, *in solido*, to the payment of all rents outstanding at the moment of the judgment.

## XI.   EIGHTH CAUSE OF ACTION-LOSS OF OPPORTUNITIES AND REPUTATION
(All prior and subsequent paragraphs and all addenda and Exhibits attached to or filed simultaneously with this Complaint are hereby incorporated by reference and made an integral part of the pleadings.)

128.   As described in paragraphs numbers 69 to 71, above, defendants' actions have brought to grief MEDHS efforts to obtain funds for development of

medical/educational programs at the hospital, as well as other programs to better the equipment and facilities themselves.

129.    In the process of telling everyone willing to listen that MEDHS and its officers have falsely represented their relation to the hospital and the medical center, in general, they have gravely damaged MEHDS and its officers standing as serious institutions and persons.  They have given the agencies, institutions and general medical profession the false impression that MEDHS and its officers are not to be taken seriously.

130.    MEDHS and its officers estimate the loss attributable to the above in, at least, $10,000,000 and pray that this Honorable Court enter judgment against all defendants, *in solido*, for the above amount.

## XII.    NINTH CAUSE OF ACTION- LOSS OF BUSINESS OPPORTUNITY

(All prior and subsequent paragraphs and all addenda and Exhibits attached to or filed simultaneously with this Complaint are hereby incorporated by reference and made an integral part of the pleadings.)

131.    As part of its lease contract with the Municipality, MEDHS obtained certain rights to develop certain portions of the total property involved in the contract.  Specifically, MEDHS has the rights to develop a medical office building and a shopping center/food court, in the land subject to the lease.  MEDHS estimates the value of said rights at no less than $5,000,000.

132.    If, at the end of these proceedings, it turns out that it is not possible to deliver the hospital as provided by the contract and the contract must be resolved, MEDHS' losses would include the above mentioned rights.

133.   MEDHS prays from this Honorable Court that, if it turns out that the contract must be resolved, it condemn the Municipality to pay $5,000,000, for loss of business opportunity.

### XIII.   TENTH CAUSE OF ACTION-DAMAGES TO OTHER SUB-LESSORS

(All prior and subsequent paragraphs and all addenda and Exhibits attached to or filed simultaneously with this Complaint are hereby incorporated by reference and made an integral part of the pleadings.)

134.   The Civil code of Puerto Rico provides, in its pertinent part, that he who gives a property to another, in exchange for rent, must ensure that the lessee enjoys the peaceful use of the property, during the duration of the contract. If he does not, the lessor answers, in damages to the affected lessee.  If the lessee's right to peaceful enjoyment of the property is challenged by a third party, the lessee must notify its landlord.  The landlord, be it owner or sub-lessor, will then have both the right and the obligation to assume the legal defense of lessee's right to peaceful enjoyment of the property.  The obligation, of course, because that is what it contracted to do.  He has the right, because the landlord will be ultimately responsible for the damages caused to the lessee, if he is disturbed in his possession of the leased asset.  He also has the right to assume the defense, because the rights of the landlord to immediate possession and/or right to rent, will be affected.

135.   In this case, MARC leased, form MEDHS, certain parts of the hospital, pursuant to the lease agreement between MEDHS and the Municipality. If it turns out that the property cannot be delivered as originally represented, then the contract must be resolved and the pure damages solution enforced.  In that

case, upon resolution, MEDHS will become answerable to MARC, for the value of its losses, including loss of future income and/or profits.  Said losses, for which MEDHS would be answerable, are estimated at not less than $10,000,000.

136.    MEDHS prays that, if the contract between MEDHS and the Municipality is resolved, that the latter be ordered to compensate MARC's losses, as they may be evidenced during trial.  Until said time, it is respectfully requested that an order be issued, to all codefendants, ordering them to cease and desist their interference with MARC (and MEDHS) rights to peaceful enjoyment of their leased portion of the facilities and their free access to the parking spaces, non of which were subleased to SISSO.


## XIV.    ELEVENTH CAUSE OF ACTION-R.I.C.O.
(All prior and subsequent paragraphs and all addenda and Exhibits attached to or filed simultaneously with this Complaint are hereby incorporated by reference and made an integral part of the pleadings.)

137.    Co-defendants, acted, and continue acting, together, with a common goal to defraud or attempt to defraud MEDHS and MARC of their contractual and property rights.  They have acquired control of SISSO and led it to misrepresent itself to the Federal Government in order to obtain or continue exploiting medical services contracts, for which it does not or did not qualify.  By conducting or influencing SISSO, a company engaged in or which affects interstate commerce, in a pattern of illegal actions, they have made themselves answerable  for violating the Racketeer Influenced and Corrupt Organizations Act, specifically 18 USC Sec 1962 (c) and (d).

138.    R.I.C.O. provides, in its pertinent part, as follows:

"It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. sec. 1962 (c)

139.   Co-defendants were jointly, at all times pertinent to this controversy, in substantial or full control of SISSO and/or SISSO's finances and operations.  Co-defendants, acting jointly, held the determining vote at SISSO's stockholder and Board of Directors meetings, held absolute control over its accounts and financial resources and, at all times relevant, held effective power to force SISSO to appoint officers with top decisional powers at the controlled entity, including its effective CEO.  Those co-defendants that were not in control or position to performed specific acts to advance the scheme describe herein, conspired with the other co-defendants to aid and abet each other, actively or passively, to achieve the goals of the conspiracy.  Said goals were:

(a)  To deprive MEDHS of its contract with the Municipality and of the fruits that said contract would produce.  That is, the rent to be paid by SISSO and by MARC, the income to be eventually produced by the parking spaces and the rent and/or dividends to be produced by the development of the medical office building and commercial mall in the site,

(b)  To deprive MARC of the value of its leasehold and the product of exploiting the same.

(c)  To achieve both of the above without loosing one day of billing medical or medical related services to the Federal Government and Health

Service Insurance Plans, by failing to inform the pertinent authorities, both state and federal, of the true state of affairs.

140.  In achieving their goals SISSO, under co-defendants' control made use of the mail, as well as the telephone or caused others to use them. The mail fraud statute is violated when a fiduciary, by use of the mails, fails to disclose material information which he is under a duty to disclose, under circumstances where the non-disclosure could or does result in harm to another. U.S. v. Weiss, 752 F. 2d 777. This has occurred in the instant case. Both SISSO and/or MMC repeatedly used or caused others to use the mails and telephone lines in the advance of their scheme. Co-defendants had full knowledge of the facts, provenance, and ownership of the certificate and licenses which had allowed SISSO to legitimately provide legal services while it operated as administrator and sub-lessee of MEDHS. Yet, co-defendants, acting jointly, aiding and abetting each other, continued operating under said licenses and certificates after they stopped recognizing and severed or attempted to sever their ties to MEDHS. In so doing, on information and belief, for a period of time they failed to notify or actively misrepresented, to Medicare and/or the health insurance companies, the change in their status. Specifically, they failed to notify Medicare and the Health Department of Puerto Rico that, notwithstanding the Municipalities posturing, and their own, MEDHS' rent was not in arrears and MEDHS was acting and still is acting as operator and administrator of the hospital. In relation to the above, they made use or caused others to make use of mail and/or interstate wire.

141. At all pertinent times, co-defendants, acting jointly, aiding and abetting each other, pursued a course of action which had the effect of defrauding or attempting to defraud MEDHS of its rent and the value of its lease and business opportunities, as well as MARC of its lease, and the value of its lease. Their course of action also on information and belief had the effect of misleading Medicare into eventual agreements with SISSO/MMC, for the later to provide medical services for which neither MMC nor SISSO, in its actual status, qualify. But if it does qualify, or appear to do so, it is as a result of fraudulent representations to the applicable regulating aughorities. Said common course was made possible by co-defendants' effective control of SISSO, and the cooperation of the Mayor, who controls the Municipality. It constitutes a continuous criminal enterprise, a pattern of activity, with no foreseeable end. By means of interstate mail and/or wire, SISSO/MMC, while under the control of the remaining co-defendants, continuously submits invoices for medical services to Medicare and/or health insurance companies. SISSO/MMC, then receives payment for said medical services which come in SISSO's name, via interstate mail or wire.

142. Co-defendants' activities amount to conducting or participating, directly or indirectly, in the conduct of SISSO's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. sec. 1962 (c). In "RICO" terms, they are the "person". By information and belief, each co-conspirator was a direct and substantial participant in the scheme, common enterprise and common course of conduct alleged herein and each one acted as the agent for

each other, in the course of the wrongdoing. By information and belief each co-conspirator aided, abetted and rendered substantial assistance in the accomplishment of the scheme

143.   Co-defendants' first victim was, of course, SISSO which is, in "RICO" terms, the "interprise". The fact that SISSO is answerable to MEDHS, does not eliminate the fact that it suffered substantial damage as a result of its control by co-defendants. The corporation needed to be capitalized. It had no need to be put in a position as a result of which it may have to return, tripled, the money it has received, in exchange for services contracted to the federal government under false pretenses.[36] Its new stockholders may feel they have benefitted from their scheme, but SISSO, certainly is in a much compromised position. The second most obvious damage is that it will have to answer to MEDHS, for its tortious actions. Finally, it may, lose its license as a health services provider, once the situation is reported to the licensing authorities. The second and third victims or attempted victims are MEDHS and MARC, as described above. The fourth and most important one is the Federal Government, mislead, by misinformation or by withholding of essential information into paying millions of dollars to what may turn out to be a non qualified recipient of Medicare funds. Also, according to MMC's representatives, loans were obtained, from banks, based on the improper transactions describe above. If in truth the loans

---

[36] SISSO has operated, for months, under MEDHS license and later, on information and belief under a license obtained by means of fraudulent representations made to the Secretary of Health. Specifically, that MEDHS had no contract and that MMC had substituted MEDHS as lessee and primary administrator of the hospital. If the federal governments chooses to understand it so, it will sue and seize treble the amount improperly paid.

were obtained as expressed by MMC's representatives, the bank's money is now in a vulnerable position, as a result of defendant's actions, herein described.

144. The Commonwealth was deceived by MMC/SISSO's misrepresentations or incomplete representations regarding the management and operation of the Municipal Hospital.[37] MMC/SISSO caused the Commonwealth to notify improperly obtained certificates by use of the mail.

145. In addition to the above overt acts, MMC/ SISSO misrepresented to the Municipality that MEDHS and MEDHS principals were endorsing their request for a Moratorium of Rent and when they obtained an approval, they did not notify MEDHS. On the contrary, they, acting in connivance with the mayor, insisted on MEDHS payment of rent not due.

146. After the Municipality announced its cancellation of the contract for non-payment of rent not due, SISSO, acting through its nominal president, agreed to the cancellation. In the letter it falsely represented that it had the authority to accept the cancellation, not only in SISSO's name, but also in MEDHS'. In so doing it put the Municipality in additional risk of having to answer for its participation in the events herein described.

147. In performing both above misrepresentations, MMC/SISSO made use of and caused others to make use of mail and interstate wire communications.

148. In taking the actions particularized herein to aid, abet and substantially assist in the commission of the acts referred to, each co-conspirator

---

[37] See Exhibit 37 Letter of February 16, 2010 requesting cancellation and emission of new certificate of need and convenience

has acted affirmatively, with an awareness of the primary wrongdoing, with full knowledge that its conduct would substantially assist in damaging MEDHS and MARC and illegally obtaining funds from the Federal Government.

149. MEDHS prays that this Honorable Court enter judgment as provided by R.I.C.O., condemning co-defendants to pay MEDHS triple the amount of damages proved, plus attorney fees.

## XV. JURY DEMAND

MEDHS demands Trial by Jury, as to all issues that can be so tried.

**WHEREFORE**, it is respectfully requested that the Court enter Judgment in favor of Plaintiff, MEDHS, and against all defendants as prayed above, with any other pronouncement that the Court may deem proper to achieve justice in this case.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 31st day of August, 2010.

/S/ Rafael González Vélez
Rafael González Vélez
USDC No. 124311
1806 Calle McLeary Suite 1-B
San Juan, Puerto Rico 00911
E-mail: rgvlo@prtc.net
Tel. 787-726-8866
Fax 787-726-8877

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MEDICAL EDUCATIONAL & HEALTH SERVICE, INC. | CASE NO.: 10-04905 (MCF) |
| Debtor | CHAPTER 11 |
| MEDICAL EDUCATIONAL & HEALTH SERVICE, INC | ADVERSARY NO.: |
| Plaintiff, | RE: BREACH OF CONTRACT, SPECIFIC PERFORMANCE, TORTIOUS INTERFERENCE WITH BUSINESS RELATION, , R.I.C.O., INJUNCTION AND DAMAGES |
| v. INDEPENDENT MUNICIPALITY OF MAYAGUEZ, HON. JOSE GUILLERMO RODRIGUEZ, IN HIS PERSONAL AND OFFICIAL CAPACITY, HIS WIFE, MRS. MARISEL MORA GONZALEZ AND THEIR CONJUGAL PARTNESHIP OF PROPERTY, DR. ORLANDO MARINI, MR. JOSE QUIROS, HIS WIFE MARY DOE QUIROS AND THEIR CONJUGAL PARTNERSHIP OF PROPERTY, SISTEMAS INTEGRADOS DE SALUD DEL SUR OESTE, INC., MAYAGUEZ MEDICAL CENTER-DR. RAMON EMETERIO BETANCES, INC., MANATI MEDICAL CENTER, INC., MR.JOHN DOE; RICHARD ROE; INSURANCE COMPANIES A, B AND C. | PLAINTIFF DEMANDS TRIAL BY JURY |
| Defendants. | |

## STATEMENT UNDER PENALTY OF PERJURY

I, Orestes Castellanos Rodriguez, of legal age, married, physician and a neighbor of Mayaguez, Puerto Rico, under penalty of perjury, declare as follows:

1.      I am the person described above.

2.      I am president of Medical Education and Health Service, Inc., Debtor/Plaintiff, in this case.

3.	I have read the Verified Complaint that precedes this Statement.

4.	The same was prepared by the above counsel following my instructions and making use of the information and documents that I provided.

5.	The allegations of facts contained in the document were reviewed by me, repeatedly, and amended when necessary to ensure that they reflect the truth, to the best of my knowledge.

_____

Orestes Castellanos Rodriguez, M.D.